UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 2: 10-23-DCR |
| ) | |
| V. ) | |
| ) | |
| MARCUS CHANDLER, DANIEL W. ) | **MEMORANDUM OPINION** |
| PROFITT, and KENNETH N. CIERS, ) | **AND ORDER** |
| ) | |
| Defendants. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the Defendants' motions to suppress certain evidence and statements that the United States intends to offer during trial. [Record Nos. 34, 36 and 41] The motions were referred to United States Magistrate Judge J. Gregory Wehrman to conduct an evidentiary hearing and to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). This hearing was conducted on June 25, 2010.[1] [Record No. 43] On July 2, 2010, the Magistrate Judge issued his report, recommending that the Defendants' motions be denied. [Record No. 47]

After reviewing the Report and Recommendation, and having considered the Defendants' objections to the Report and Recommendation, the Court will deny the motions to suppress. In summary, the Court concludes that, based on information supplied by the informant, the agents'

---

[1] The parties did not request that a transcript be prepared following the evidentiary hearing before Magistrate Judge Wehrman. Further, the Defendants do not contest any of the Magistrate Judge's factual determinations. However, because of the general nature of the Defendants' objections to the Magistrate Judge's Report and Recommendation, it is necessary to provide a detailed summary of the undisputed facts.

-1-

subsequent investigation concerning the informant and Defendant Chandler, the agents' observations and surveillance on February 4, 2010, and the agents' training and experience, probable cause existed to conduct a stop and warrantless search of the vehicles driven by Proffit and Ciers as well as the occupants of those vehicles.

## I.

Defendants Marcus Chandler, Daniel Profitt and Kenneth Ciers were indicted on various federal drug charges on April 8, 2010.  All three Defendants were listed in Count 1 which charged that, from on or about September 2009 through on or about February 4, 2010, the Defendants conspired with each other and others to knowingly and intentionally distribute and possess with intent to distribute a mixture or substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Likewise, all Defendants were named in Count 2 which charged that, on February 4, 2010, the Defendants, aiding and abetting each other, did knowingly and intentionally possess with intent to distribute a mixture or substance containing a detectable amount of oxycodone, a Schedule II substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  In Count 3, Defendant Chandler is charged with knowingly and intentionally possessing with intent to distribute oxycodone.  And in Count 4, Chandler is charged with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).  The charges stem from an investigation which initially involved an anonymous caller – later identified as the roommate of Defendant Chandler.  The call prompted further investigation by the Northern Kentucky Drug

Strike Force ("NKDSF") and ultimately resulted in the surveillance and arrest of the Defendants on February 4, 2010, in Kentucky and Ohio.

On May 27, 2010, Defendants Profitt and Chandler moved the Court to suppress any and all statements made and evidence seized during the February 4, 2010, arrests. [Record Nos. 34 and 36] The motions were based, in part, on the anonymous nature of the information provided to the investigating officers. According to the Defendants, the officers lacked probable cause to initiate a traffic stop and arrest of the Defendants. And they assert that because the NKDSF did not have probable cause or reasonable suspicion to initiate a traffic stop, they could not request another agency to stop and detain or arrest others charged in the case. On June 10, 2010, Defendant Ciers filed a motion to suppress, making arguments similar to those advanced by his co-Defendants. [Record No. 41]

### A.     The Information Provided to the NKDSF and Its Resulting Investigation

The testimony offered during the evidentiary hearing before Magistrate Judge Wehrman severely undercuts the Defendants' assertions that the NKDSF did not conduct an appropriate and thorough investigation which provided probable cause for the detention and arrest of the Defendants. As the Magistrate Judge explained, the investigation commenced when Sergeant Bill Birkenhauer received a telephone call on January 26, 2010 from Brian Hamilton regarding drug activity being conducted by his roommate, Marcus Chandler. Although Hamilton initially expressed a desire to remain anonymous, he ultimately identified himself to Sergeant Birkenhauer.[2] Hamilton advised that Chandler was selling large quantities of Oxycontin and that

---

[2]     Sergeant Birkenhauer is a Field Supervisor for the NKDSF. He has 18 years experience as a narcotics agent and significant experience in narcotics enforcement. He has testified before this Court as an expert

he made frequent trips to Northern Ohio for that purpose. Sergeant Birkenhauer obtained Hamilton's name, address and telephone number and assigned the matter to Agent Brett Benton for further investigation.

Agent Benton met with Hamilton later on January 26, 2010. At that time and through later contacts with Hamilton, Benton learned additional details regarding the drug operation being conducted by Defendant Chandler. In relevant part, Hamilton advised agents of the NKDSF that Chandler made trips to Northern Ohio at least every other week, that Chandler would pay for Oxycontin and obtain a new shipment on each trip, that the supplier was from Detroit, Michigan, that Chandler would meet with his source of supply at Exit 122 or at the Wendy's restaurant just off Exit 125, that the supplier drove a dark colored sedan, and that Chandler never drove himself but would employ different drivers. Hamilton claimed to have the details of Chandler's operations because he had previously acted as his driver. Hamilton provided further details, including that Chandler would obtain a full tank of gas and supply the driver – usually an addict – with an 80 mg tablet of Oxycontin in exchange for driving him to Northern Ohio. According to Hamilton, the person with whom Chandler would meet to obtain additional drugs in exchange for payment was not the main supplier.

Hamilton also provided the agents with information regarding his living arrangement with Chandler. According to Hamilton, he began living with Chandler after Chandler's father was either arrested or investigated by the Lexington Drug Enforcement Agency for selling large quantities of Oxycontin. At that time, the DEA was also investigating Chandler. And according

---

witness on several occasions. [Record No. 47, p. 2]

-4-

to Hamilton, Chandler maintained a safe for the storage of Oxycontin at his house that he shared with Hamilton. Further, after the initial call, agents were able to confirm many of relevant details. For example, they were able to confirm that Chandler's father had been investigated and arrested in Lexington for distributing Oxycontin.

On February 4, 2010, Hamilton notified Agent Benton that Chandler was planning to make another trip to Northern Ohio to purchase 100 to 200 Oxycontin tablets and was looking for a driver. Agents of the NKDSF then conducted surveillance of Chandler's residence and observed a black Ford F-150 truck arrive at that location. (Agents later identified Defendant Profitt as the driver of the Ford truck.) Agents followed the truck and observed two stops, including one at a gas station, before it returned to Chandler's residence. Although Hamilton was not at home at the time of this activity, he was in contact with Chandler (and NKDSF agents) by telephone.

Hamilton was advised by Chandler throughout the day that Chandler planned to make his usual trip to Northern Ohio to obtain Oxycontin and that the transaction would take place at the Wendy's restaurant parking lot near Exit 125. However, Chandler advised Hamilton that he was having difficulty finding a driver and that it might be necessary for Hamilton to drive. Later that afternoon, however, Chandler advised Hamilton that Profitt had agreed to drive him to Northern Ohio.[3] (According to Hamilton, Profitt had previously purchased Oxycontin from Chandler.)

Based on the information received from Hamilton, Sergeant Birkenhauer contacted the Ohio Highway Patrol and spoke with Sergeant Schultz to advise him of the ongoing

---

[3]   This information was received as the investigating agents were obtaining a tracking device to be installed on Hamilton's vehicle.

investigation and the events which were expected to transpire at the Wendy's restaurant in Northern Ohio. Sergeant Birkenhauer requested that the Ohio Highway Patrol assist with surveillance at the restaurant and Sergeant Schultz agreed to place an unmarked unit in the restaurant's parking lot.

Chandler and Profitt left the Chandler/Hamilton residence in Profitt's black Ford truck in the early evening on February 4, 2010, and were followed by members of the NKDSF as they proceeded to the Wendy's restaurant parking lot just off Exit 125 in Northern Ohio. The truck remained in constant surveillance during the trip and made no other stops during the three hour drive. Shortly after Chandler and Profitt arrived and entered the restaurant, a black Oldsmobile Alero sedan drove into the parking lot and parked next to the black truck belonging to Profitt. Profitt stayed inside, but Chandler exited the restaurant, walked to the black Oldsmobile, opened the passenger-side door and entered the vehicle. Less than five minutes later, Chandler exited the sedan and returned to the restaurant. During this time, no one other than Chandler exited the sedan. After Chandler returned to the restaurant, the sedan left the parking lot and was followed by an unmarked Ohio Highway Patrol vehicle.

Within fifteen minutes, Chandler and Profitt returned to Profitt's truck and headed south on Interstate 75 toward Kentucky. Birkenhauer testified that, based on his training and experience as well as surveillance and information that had been obtained throughout the investigation, he believed that a drug transaction had been completed in the restaurant parking lot. Further, he believed that the information initially supplied by Hamilton had been corroborated by the actions of Chandler and Profitt. As a result, Birkenhauer communicated this

information to the Ohio Highway Patrol and requested assistance in stopping the black Oldsmobile. This traffic stop was completed approximately one hour later. During the stop, officers recovered a large amount of currency.

### B.     The Stop, Search and Arrest Involving Defendants Chandler and Profitt

Although Chandler and Profitt were not stopped initially, they remained under surveillance by the NKDSF agents. Once Chander and Profitt were in Kentucky, agents requested that a marked cruser (operated by Kenton County Officer Darrell Caldwell) assist with the traffic stop of Profitt's vehicle. At the time of this stop, NKDSF agents were aware that the black Oldsmobile had been stopped and that a large amount of currency had been recovered from that vehicle. The government concedes that no traffic violations were observed concerning Profitt's vehicle. Instead, the stop was made based solely on the request of NKDSF agents.

No display of force was made during the traffic stop of Profitt's vehicle. During the stop, Birkenhauer asked Profitt to explain the purpose of the trip and was told that he had driven Chandler to Ohio to "look at a truck." Profitt and Chandler were then asked to exit the vehicle and were patted-down for weapons but none were discovered. Shortly after the stop, a drug dog was brought to the scene. (Two agents involved in the surveillance had trained canines.) As an agent placed his arm on Chandler's arm to guide him to an officer's patrol car, the agent felt an unusual bulge on Chandler's arm, giving him reason to investigate further. This investigation resulted in the discovery of 140 Oxycontin tablets taped to Chandler's bicep area. Chandler and Profitt were then placed under arrest. Approximately 15 minutes elapsed from the stop until the arrest of the two Defendants in Kentucky.

Following their arrest, Chandler and Profitt were transported to the Lakeside Park/Crestview Hills police station and questioned by NKDSF agents. Both Chandler and Profitt made admissions regarding their conduct. Additionally, Chandler provided the agents with written consent to search his residence. Following this search, agents discovered additional prescription pills, drug paraphernalia, currency, and a stolen handgun.

### C. The Surveillance and Traffic Stop of Defendant Ciers

After leaving the Wendy's restaurant parking lot, the Oldsmobile Alero was followed by Trooper Stacey Arnold of the Ohio Highway Patrol. Trooper Arnold has 16 years experience as a law enforcement officer with the past 12 years spent on enforcement of criminal laws and 10 years as a canine handler. Trooper Arnold was provided with details of the investigation by Sergeant Schultz as it was relayed to him by the Kentucky agents. Arnold testified that she followed the Oldsmobile for approximately 60 miles after it left the Wendy's lot. Around milepost 187, the vehicle crossed the right edge line of the highway "more than once" and fluctuated its speed from the speed limit to slightly over the speed limit. She then stopped the vehicle for the unmarked lanes violation under O.R.C. §4511.33. The traffic stop occurred at 9:17 p.m. In addition to Trooper Arnold, Sergeant Schultz participated in the stop. The vehicle was driven by Defendant Kenneth Ciers.

Trooper Arnold testified that, as she approached Ciers' vehicle, the driver was observed making "furtive movements" around the center console area. Upon request, Ciers produced his drivers license and registration. These documents confirmed that Ciers resided in the Detroit, Michigan area. Trooper Arnold advised Ciers that he had been stopped for crossing over the

lane line, and fluctuating speed, and asked if he was too tired to drove or if he had been drinking. Ciers responded in the negative to both questions. In addition to his license and registration, Ciers produced a "stack of paperwork," explaining that he had previously had some issues with his driving privileges. However, he indicated that the paperwork would confirm that the issues had been resolved. According to Trooper Arnold, Ciers was "fumbling" with the paperwork and appeared to be "very nervous." In addition, his hands appeared to shaking. When asked about the trip to Ohio, Ciers responded that he had argued with a family member in Michigan and was driving to "get some air." Arnold testified that she found this response "suspicious."

Trooper Arnold asked Ciers to exit the vehicle while Sergeant Schultz ran a check of the paperwork Ciers had provided. Although Ciers indiated that he did not have any weapons on his person, Trooper Arnold observed that Ciers "bladed" his body two times, which she described as an attempt to conceal something on his right side. Concerned about the possibility of a weapon, Arnold instructed Ciers to take his hands out of his pockets and then proceeded to conduct a pat-down. During the course of the pat-down, Arnold observed a large bundle of money in Ciers' right jacket pocket. Due to the belief that Ciers might also have a weapon in his pocket, the Defendant was handcuffed.[4]

Although no weapon was found, Trooper Arnold read Ciers his Miranda rights, advised him he was under investigative detention, and placed him in the rear seat of Schultz's vehicle to permit her trained drug dog to search the vehicle. Although the dog alerted to the presence

---

[4] The Magistrate Judge's Report and Recommendation indicates that the videotape taken from Trooper Arnold's vehicle reflects Trooper Arnold stating, "I'm not exactly sure what's going on here but for my partner's safety, I'm handcuffing you." [Record No. 47, p. 9]

of drugs, no drugs were found. According to Trooper Arnold, the lack of drugs was not particularly unusual because the dog will alert even if drugs were present recently because an odor will remain in some instances. The Ohio officers then notified the NKDSF that they had recovered $9,900 in currency. Ciers was detained for approximately 24 minutes from the time Trooper Arnold activated her lights until Ciers was taken to the nearby police station. There, police confiscated the currency but did not immediately charge Chers with any felony offenses. The total incident time was listed on Trooper Arnold's report as being one hour, twenty minutes.

**II**.

Based on the foregoing facts, Magistrate Judge Wehrman concluded that the Defendants' motions to suppress should be denied. Defendant Profitt objects the Magistrate Judge's Report and Recommendation on four grounds. First, he simply incorporates as a general matter the arguments contained in his motion to suppress. Second, he contends that the United States did not carry its burden of proof in establishing that the arresting officers had a reasonable basis to stop his vehicle and seize evidence from him or take his statement incident to his arrest. Next, he again asserts that there was insufficient evidence of probable cause for the traffic stop on February 4, 2010. As a result, he argues that the stop was illegal. Finally, he states that, because the traffic stop was invalid, the statements taken by the officers must be suppressed during trial. [Record No. 48]

Defendant Chandler make similar objections to those advanced by Profitt. He also contends that probable cause was lacking for the stop on February 4th, and that the only new evidence presented during the June 25, 2010, hearing was the name of the name of the informant.

Like Profitt, he also argues that the United States failed to carry its burden of proof in establishing a reasonable basis for the arresting officers to stop the vehicle in which Chandler was a passenger. With respect to this issue, he also asserts that after stopping the vehicle, an unreasonable time passed without finding contraband.

Defendant Ciers repeats and expands his objections to the Magistrate Judge's Report and Recommendation. According to Ciers: (1) the Magistrate Judge's determination is clearly erroneous; (2) information given to law enforcement (presumably by Hamilton) was not credible[5], not reliable, and was not verified as it relates to him; (3) the United States failed to establish any reasonable basis for the seizure of his vehicle after following him for 30 to 60 miles[6]; (4) there was insufficient verification regarding Ciers involvement because police did not obtain information regarding the ethnicity of the person supplying Chandler with Oxycontin, there was not specificity regarding the vehicle or its license plate, no one witnessed the drug transaction, and the Wendy's location was not specified; (5) Ciers was unconstitutionally detained and interrogated after he was stopped for the alleged traffic violation; and (6) there is insufficient evidence to support the stop and, as a result, any evidence or statements obtained from him are improper and should be suppressed. [Record No. 50]

Having reviewed the Magistrate Judge's Report and Recommendation and having examined the authorities cited by him and the parties, the Court concludes that the Defendants'

---

[5] Defendant Ciers provides no basis to challenge the Magistrate Judge's credibility determination regarding the witnesses testifying during the June 25, 2010, hearing.

[6] In connection with this argument, he also asserts that the stop of his vehicle was pretextual and in violation of the Sixth Circuit's holding in *United States v. Freeman*, 290 F.3d 464, 466 (6th Cir. 2000).

motions to suppress should be denied. As a general matter, and as the Magistrate Judge correctly stated in his Report and Recommendation, stopping a vehicle and detaining its occupants constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Such a stop is constitutional when an officer has probable cause to believe that a traffic violation has been committed or when an officer has a "particularized and objective basis" for suspecting that the occupants of the vehicle are engaged in criminal activity. *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007); *United States v. Keith*, 559 F.3d 499, 503 (6th Cir. 2005). The totality of the circumstances must be considered in determining whether an investigatory stop is reasonable.

In the present case, the Magistrate Judge concluded that the government established that probable cause existed for the traffic stop of Defendant Ciers. While it is undisputed that Trooper Arnold was looking for a reason to stop this Defendant, she did not do so until Ciers committed a traffic violation. While the traffic stop was pretextual in the sense that the trooper was looking for a reason to stop Ciers, that motivation does not render the officer's actions unconstitutional. *Whren v. United States*, 517 U.S. 806, 813 (1996). Further, nothing in the record causes the undersigned to question the Magistrate Judge's credibility finding regarding Trooper Arnold. Instead, the video recording confirms that Arnold advised Ciers of the reason for the stop and he did not express any disagreement with the reasons given by the trooper.

The undersigned also agrees with the Magistrate Judge's conclusion that the facts presented in *United States v. Huguenin*, 154 F.3d 547 (6th Cir. 1998), are distinguishable from those presented in the present case. While *Huguenin* involved the traffic stop of a vehicle

without probable cause, the stop of Ciers' vehicle did not. As the Sixth Circuit observed in *Huguenin*, "a police officer, who suspects that a motorist is transporting drugs, may follow the motorist until he breaks any minor traffic rule and may pull him over under the pretext of enforcing that minor traffic rule." *Id.* at 554, n. 5.

Likewise, the Sixth Circuit's holding in *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000)[7], does not compel a contrary result. Unlike *Freeman*, the officer conducting the stop and search of Ciers' vehicle did not observe a single, brief incident of partial weaving which did not constitute probable cause for a traffic stop based on a lane violation under Tennessee law. As the Magistrate Judge observed:

> Based on the testimony of Trooper Arnold, however, I conclude that the Government has met its burden even if *Freeman* remains good law. Trooper Arnold testified that she observed Ciers' vehicle cross over the right fog line on at least two occasions, not merely one time as in *Freeman*. While the extent of the violation may be splitting hairs on some level, that case is further distinguishable by the fact that the violation in *Freeman* was observed for only one-third of a second, and involved a bulky top-heavy motor home rounding a curve in the road on a windy day in an open area known for high winds. . . . In contrast in this case, there was no evidence that the sedan [driven by Ciers] was subject to being blown about by winds, and the observed violation occurred on more than one occasion on an area of the highway presumed (from the video) to be a straightaway.

[Record No. 47, p. 15] In addition, the Magistrate Judge recognized that Trooper Arnold was not required to ignore the information that she had been provided previously by Sergeant Schultz and the NKDSF. This additional information provided an independent basis for an investigatory

---

[7] The Magistrate Judge also notes correctly that the holding in *Freeman* has been highly criticized and its continuing vitality has been questioned on several occasions. *See e.g., United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008); *Gaddis ex rel Gaddis v. Redford Township*, 364 F.3d 763, 770 (6th Cir. 2004); *United States v. Sanford,* 476 F.3d 391, 396 (6th Cir. 2007).

stop based on Trooper Arnold's reasonable suspicion that Ciers was involved in drug trafficking. In making this assessment, Trooper Arnold was entitled to rely upon information that had been provided by other investigating officers who had reasonable suspicion to justify the stop. *United States v. Hensley*, 469 U.S. 221 (1985).

Further, contrary to all of the Defendants' arguments, the information provided by the informant (Hamilton) was not uncorroborated and provided sufficient details to justify the officers actions on February 4, 2010. Hamilton identified himself at the outset of the investigation and was in daily contact with the investigating officers. The officers were able to confirm details provided by Hamilton concerning Chandler and his father. Hamilton was not a mere acquaintance of Chandler; he was his roommate and had assisted Chandler on at least one occasion by driving him to a drug transaction.

Based upon all of the information gained during the investigation, the officers has a reasonable basis to believe that Chandler made frequent trips to the Northern Ohio area to obtain Oxycontin from a supplier located in the Detroit, Michigan area. In addition, location of past and likely future transactions was known as was the type of vehicle driven by the supplier. Through surveillance, the officers also had reason to believe that Chandler's actions at the Wendy's restaurant parking lot constituted completion of the drug transaction involving the person in the Oldsmobile vehicle. The actions of the driver of the Oldsmobile following the transaction at the Wendy's restaurant provided further corroborating evidence to support the traffic stops of the two vehicles.

The Court also rejects Ciers' assertion that his traffic stop was longer than necessary and, therefore, unreasonable. In light of Ciers' responses to Trooper Arnold's questions, an additional period of time would be necessary to review the documents provided by Ciers to confirm his story. However, as the Magistrate Judge points out, regardless of the stated justification for the stop provided to Ciers, Trooper Arnold was not required to ignore the information previously provided regarding Ciers' suspected drug trafficking activities. It was clearly reasonable to inquire about weapons and equally reasonabe to conduct a brief pat-down search for weapons based on her observations and the Defendant's actions. *United States v. Walker*, 181 F.3d 774, 778 (6th Cir.), *cert denied*, 528 U.S. 980 (1999). Also, after the large wad of cash was discovered, it was reasonable to secure the Defendant with handcuffs to further examine his pockets for a weapon and to permit the canine to inspect his vehicle. In short, by the time the cash was discovered, Trooper Arnold had probable cause to search the vehicle and to further detain Ciers. Because Ciers does not seek to suppress: (1) any evidence discovered after the seizure of the cash; or (2) any incriminating statements made during the time he was detained, the total length of time he was detained is not relevant to the issues presented.

Finally, the Court also agrees with the Magistrate Judge's conclusions regarding the stop of Proffit and Chandler which was based solely on information provided by Hamilton and the officers' investigation and observations on February 4, 2010. Again, contrary to the Defendants' arguments, Hamilton provided the investigating officers with more than vague information. Instead, the information he provided was verified to the extent possible. The agent's ongoing investigation confirmed that Hamilton was a reliable witness with knowledge of the Defendants'

drug activities.  Clearly, at the time Chandler and Profitt were stopped by officers in Kentucky, there was more than probable cause to support the stop.  The subsequent pat-down of these Defendants for weapons was reasonable.  Further, the officers discovery of the bulge on Chandler's arm provided grounds for further search.

In summary, the Fourth Amendment was not violated in any way by the investigating officers in Kentucky and Ohio.  The Defendants' motions to suppress and their objections to the Magistrate Judge's Report and Recommendation are without merit and will be rejected.

### III.

Based on the foregoing, it is hereby

**ORDERED** as follows:

1. The Report and Recommendation of United States Magistrate Judge J. Gregory Wehrman [Record No. 47] is **ADOPTED** and **INCORPORATED** herein by reference.

2. The Defendants' objections to the Magistrate Judge's Report and Recommendation [Record Nos. 48, 49 and 50] are **OVERRULED**.

2. The Defendants' motions to suppress [Record Nos. 34, 36 and 41] are **DENIED**.

This 20th day of July, 2010.



Signed By:
*Danny C. Reeves* DCR
United States District Judge